Xinying Valerian (SBN 254890)
xinying@valerian.law
VALERIAN LAW
1300 Clay Street, Suite 600
Oakland, CA 94612
Telephone: (888) 686-1918
Facsimile: (510) 982-4513

Danielle Fuschetti (SBN 294064)
dfuschetti@sanfordheisler.com
SANFORD HEISLER SHARP, LLP
111 Sutter Street, Suite 975
San Francisco, CA 94104
Telephone: (415) 795-2020
Facsimile: (415) 795-2021

*Attorneys for Petitioner and Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| MARCELLA JOHNSON, On Behalf of Herself and All Others Similarly Situated, <br><br>    PETITIONER, <br> v. <br><br> ORACLE AMERICA, INC., <br><br>    RESPONDENT. | Case No. 3:17-cv-05157-EDL <br><br> **NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION** <br><br><br> Date: November 7, 2017 <br> Time: 9:00 A.M. <br> Crtrm: E, 15th Floor <br> Judge: Hon. Elizabeth D. Laporte |

**TO RESPONDENT ORACLE AMERICA, INC. AND ITS COUNSEL OF RECORD, PLEASE TAKE NOTICE THAT** on November 7, 2017 at 9:00 AM in Courtroom E of the above-entitled court, Petitioner, also referenced herein as Claimant, will and hereby does move for an order compelling Respondent Oracle to arbitrate Claimant's demand in JAMS in San Francisco and, specifically:

(a) To order Oracle to arbitrate this matter before JAMS including all disputes over arbitrability, save for the narrow exception of the enforceability of the class, collective, and representative action waiver; and to comply forthwith with JAMS' determination that the existence and validity of the agreement under which Arbitration is sought is itself an arbitrable dispute; or

(b) In the alternative, to order the Parties to arbitration on the basis of the 2013 Employment Agreement & Mutual Agreement to Arbitrate; and

(c) To order Oracle to pay all arbitration costs unique to the arbitration forum and comply with JAMS rules regarding the appointment of an arbitrator

This Motion is based upon this Notice of Motion and the attached Memorandum of Points and Authorities, the Declaration of Marcella Johnson and all exhibits attached thereto, the Declaration of Xinying Valerian and all exhibits attached thereto, all pleadings, records and papers on file in this action, and such other further evidence and arguments as may be presented at the time of the hearing on this matter.

Dated: October 5, 2017                    **VALERIAN LAW**


By: _/S/ Xinying Valerian_____
Xinying Valerian
*Counsel for Petitioner and Proposed Class*

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 2

    A.  Summary of Petitioner's Claims ................................................................. 2

    B.  Oracle's Mandatory Employment Agreement and Agreement to Arbitrate. .......... 2

    C.  Oracle's Terms and Conditions and Incentive Compensation Plans. ..................... 3

        (i)    Oracle Maintains That Employee Notice and Consent is Not Necessary for the T&Cs and the ICPs to Apply. ..................................................... 3

        (ii)   Oracle Imposed the FY15 T&Cs and FY15 ICP on Petitioner Without Proper Notice and Without Her Signed Consent ................................... 4

        (iii)  Oracle Buried an Arbitration Provision 84 Pages Into the 96-page T&Cs. .... 5

    D.  Oracle Has Relied on the Employment Agreement (Agreement #1) to the Exclusion of Appendix 9 (Putative Agreement #2) in Similar Cases. ..................... 7

        (i)    *Gee v. Oracle*: Oracle used the Employment Agreement to question the DLSE's jurisdiction over a claim filed by a Fiscal Year 2015 sales employee. ..... 7

        (ii)   *Oracle v. Wilson*: Oracle arbitrated a commission case to conclusion on the basis of the Employment Agreement .................................................... 8

        (iii)  Discovery into other cases will reveal the extent to which Oracle has arbitrated pursuant to the Employment Agreement in recent years ..................... 9

    E.  Oracle Failed to Produce the FY15 T&Cs, In Violation of California Law. .......... 9

    F.  Oracle Has Improperly Relied on Appendix 9 to Resist and Stall Arbitration. ...... 9

    G.  Petitioner Filed the Instant Petition to Compel Arbitration ................................. 11

III.  LEGAL STANDARD ........................................................................................ 12

IV.   ARGUMENT ...................................................................................................... 12

    A.  The Questions at Issue are Reserved for the Arbitrator. ....................................... 12

        (i)    Once a party's substantive claim is designated for arbitration, issues on how that claim will proceed – including contractual questions as to whether class procedures are available – are procedural matters for the arbitrator. ................... 13

        (ii)   Incorporation of JAMS rules constitutes clear and unmistakable general delegation of authority to arbitrate arbitrability. ..................................... 14

        (iii)  Under *Mohamed v. Uber*, all arbitrability questions save for the class waiver must go to the arbitrator. ............................................................... 16

        (iv)   Oracle's arguments about the class waiver provision are premature and, in any event, should not delay arbitration of all other arbitrability questions. ......... 16

    B.  If the Court Holds that the Arbitrator Lacks Authority to Determine Which Arbitration Agreement Controls, it Should Find that Agreement #1 Controls. ........... 17

        (i)    Judicial estoppel bars Oracle from asserting that the first arbitration agreement is inapplicable .................................................................... 17

(ii)    There was no valid modification................................................... 19

(iii)   Oracle gave inadequate and unreasonable notice ........................................ 21

(iv)    There is no competent evidence of the formation of a second contract with mutual intent to replace the first. .......................................................... 22

(v)     Appendix 9 cannot lawfully apply to "existing disputes and claims". ........ 22

(vi)    Appendix 9 is unconscionable .................................................... 23

(vii)   Tailored arbitrability discovery is necessary – but overlaps with merits discovery. ........................................................................................ 24

C.  Assuming that Agreement #1 Applies, Whether it Permits Class Arbitration is a Clause Construction Matter for the Arbitrator ........................................................... 24

V.    CONCLUSION.................................................................................... 25

PET. MARCELLA JOHNSON'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AT&T Technologies, Inc. v. Communications Workers of Am.*,
  475 U.S. 643 (1986).........................................................................................14

*Baughman v. Walt Disney World Co.*,
  685 F.3d 1131 (9th Cir. 2012) ....................................................17, 18

*BG Group, PLC v. Republic of Argentina*,
  134 S. Ct. 1198(2014)...................................................................13

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) ....................................................13, 15

*Citigroup, Inc. v. Abu Dhabi Investment Auth.*,
  776 F.3d 126 (2d Cir. 2015)............................................................13

*Colvin v. NASDAQ OMX Group, Inc.*,
  No. 15-cv-02078-EMC, 2015 U.S. Dist. LEXIS 149932,
  (N.D. Cal. Nov. 4, 2015)(Chen, J.) ...............................................23

*Davis v. CACH, LLC*,
  No. 14-cv-03892-BLF, 2015 U.S. Dist. LEXIS 25088
  (N.D. Cal. Mar. 2, 2015) ..............................................................25

*Davis v. Nordstrom, Inc.*,
  755 F.3d 1089 (9th Cir. 2014) ....................................................20, 21

*Davis v. Nordstrom, Inc.*,
  No. C 11-3956 CW, 2012 U.S. Dist. LEXIS 139563
  (Sept. 27, 2012) (Wilken, J.) ..........................................................20

*Davis v. O'Melveny & Myers*,
  485 F.3d 1066 (9th Cir. 2007) ........................................................23

*Ferguson v. Countrywide Credit Indus., Inc.*,
  298 F.3d 778 (9th Cir. 2002) ....................................................19, 20

*Green Tree Fin. Corp. v. Bazzle*,
  539 U.S 444 (2003).............................................................13, 14, 25

*Hersh v. Nat'l Found. Life Ins. Co.*,
  No. C-11-03289, EDL 2012 U.S. Dist. LEXIS 14133
  (N.D. Cal. Feb. 6, 2012) (Laporte, J.)................................................17

*Kilgore v. KeyBank, N.A.*,
  673 F.3d 947 (9th Cir. 2012) ..........................................................23

*Lee v. JPMorgan Chase & Co.*,
  982 F.Supp.2d 1109 (C.D. Cal. 2013) ................................................14

*Lifescan, Inc. v. Premier Diabetic Servs.*,
    363 F.3d 1010 (9th Cir. 2004) ................................................................12

*Mohamed v. Uber Technologies*,
    848 F.3d 1201 (9th Cir. 2016) .........................................................13, 16

*Morris v. Ernst & Young, LLP*,
    834 F. 3d 975 (9th Cir. 2016) ...............................................................24

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)................................................................................17

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
    724 F.3d 1069 (9th Cir. 2013) .........................................................13, 15

*Rent -A-Center, West, Inc., v. Jackson*,
    561 U.S. 63 (2010)..................................................................................15

*Rissetto v. Plumbers and Steamfitters Local 343*,
    94 F.3d 597 (9th Cir. 1996) ...................................................................17

*Sanford v. Memberworks, Inc.*,
    483 F.3d 956 (9th Cir. 2007) .................................................................14

*Toppings v. Meritech Mortg. Servs.*,
    140 F. Supp. 2d 683 (S.D. W. Va. 2001)..............................................24

*Yahoo! Inc. v. Iversen*,
    836 F. Supp. 2d 1007 (N.D. Cal. 2011) (Koh, J.).................................24

**California Cases**

*Armendariz v. Foundation Health Psychcare* Servs., Inc.,
    99 Cal. Rptr. 2d 745 (2000) ..................................................................24

*Asmus v. Pac. Bell*,
    23 Cal. 4th 1 (Cal. 2000) .......................................................................21

*Avery v. Integrated Healthcare Holdings, Inc.*,
    159 Cal. Rptr. 3d 444 (Cal. Ct. App. 2013) ....................................22, 23

*Iskanian v. CLS Transp. Los Angeles, LLC*,
    59 Cal. 4th 348 (Cal. 2014) ..................................................................23

*Malone v. Superior Court*,
    173 Cal. Rptr. 3d 241 (Cal. Ct. App. 2014)..........................................15

*Mercuro v. Superior Court*,
    116 Cal.Rptr.2d 671 (Cal. Ct. App. 2002)..............................19, 20, 23

*Peleg v. Neiman Marcus Group, Inc.*,
    204 Cal.App.4th 1425 ............................................................................22

PET. MARCELLA JOHNSON'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

*Rebolledo v. Tilly's, Inc.*,
    175 Cal.Rptr.3d 612 (Cal. App. 2014) ................................................20

*Sandquist v. Lebo Automotive Inc.*,
    1 Cal. 5th 233 (2016) ....................................................................14, 25

**Federal Statutes**

Federal Arbitration Act ....................................................2, 8, 11, 12, 14

Federal Rules of Evidence
    Rule 602 ....................................................................................22
    Rule 1002 ..................................................................................22

9 U.S.C. §2 ....................................................................................12

29 U.S.C. § 158 ..............................................................................24

**California Statutes**

California Code of Civil Procedure
    §1281.96 ....................................................................................9
    §1281.8 ......................................................................................23

California Labor Code
    § 1198.5 ......................................................................................9
    § 432 ..........................................................................................9

**Other Authorities**

AAA Supplementary Rules for Class Arbitration, Rule 9 ...............................25

JAMS Class Action Procedures
    Rule 1(a) ....................................................................10, 11, 14, 16
    Rule 2 ......................................................................................25

JAMS Employment Arbitration Rule 11 ..........................................10, 12, 15

    

PET. MARCELLA JOHNSON'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The parties' agreement – imposed by Oracle on its employees – calls for arbitration before JAMS, but Oracle refuses to participate. Ms. Johnson therefore seeks to compel arbitration in compliance with JAMS rules. *See* Dkt. 1, Petition, Prayer for Relief.

Oracle has stonewalled the arbitration for months by insisting that, under a purported second agreement, JAMS lacks authority to decide any issues arising from Claimant Johnson's class arbitration demand. Notably, Oracle continues to maintain the position that arbitration may not go forward (and that it will not help select a mediator or pay its share of fees) even after Claimant amended her pleadings to add individual claims; there is no question that JAMS has jurisdiction over these claims.

Under clear Supreme Court and Ninth Circuit law, Oracle is wrong. JAMS has jurisdiction over Claimant's dispute against Oracle and it is up to the arbitrator to determine whether class procedures are available. Regardless of which agreement applies, both contain broad arbitration provisions and incorporate JAMS and AAA rules; these terms compel the conclusion that arbitrability disputes (save for enforceability of express class waivers) are the province of the arbitrator. The threshold question of which agreement applies has been clearly and unmistakably delegated to the arbitrator, and can be resolved without implicating the class waiver in the putative second agreement.[1]

The Court should not be misled by Oracle's plea that its now-preferred agreement governs. Oracle has taken the opposite position in other recent cases, where it has relied on salespeople's Employment Agreements (Agreement #1) rather than Appendix 9 (putative Agreement #2) to support arbitral jurisdiction. Further, controlling case law is clear about the requirements for modification of similar agreements. Oracle has not satisfied them.

Accordingly, in the alternative, the Court should determine that Agreement #1

---

[1] If the arbitrator determines that the second agreement governs, it may proceed on Plaintiff's individual claims and refer the enforceability of the class waiver to this Court.

PET. MARCELLA JOHNSON'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

controls and refer all issues regarding the interpretation of that Agreement to the arbitrator.

## II.   FACTUAL BACKGROUND

### A.   <u>Summary of Petitioner's Claims</u>

Oracle America, Inc. is a Fortune 100 technology giant headquartered in Redwood City, CA. Petitioner Marcella Johnson ("Johnson") was a sales representative for Oracle from March 2013 to July 2014. Throughout that time, Oracle systematically denied her and other sales representatives their lawful commission wages; Oracle further compelled Ms. Johnson to work against her will for months in order to pay off a supposed "debt" to the company. Dkt. 1-2 (Petition, Ex. B, First Amended Demand for Class Arbitration).

### B.   <u>Oracle's Mandatory Employment Agreement and Agreement to Arbitrate</u>

Oracle's records reflect that, prior to Johnson's first day of employment, Oracle required her to consent to an Employment Agreement & Mutual Agreement to Arbitrate ("Employment Agreement" or "Agreement #1"). *See* Declaration of Xinying Valerian ISO Pet. Mot. To Compel Arb. ("Valerian Decl."), ¶ 1, Ex. A. According to Oracle, Johnson acknowledged and accepted the Agreement on March 1, 2013. *Id*, ¶ 2, Ex B.  Johnson's first day of work was March 18, 2013. *Id.,* ¶ 3, Ex C.

The Employment Agreement provides:

> You and Oracle understand and agree that any existing or future dispute or claim arising out of or related to your Oracle employment, or the termination of that employment, will be resolved by final and binding arbitration ....

> The arbitration proceedings shall be conducted pursuant to the Federal Arbitration Act, and in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association or the Employment Arbitration Rules and Procedures adopted by Judicial Arbitration & Mediation Services ("JAMS"). The arbitrator will have all the powers a judge would have in dealing with any question or dispute that may arise before, during and after the arbitration.

Valerian Decl., Ex A, p. 2. The Employment Agreement also includes the following modification provision: **"This Employment Agreement & Mutual Agreement to Arbitrate may be modified *<u>only</u>* in a writing, expressly referencing this Agreement and you by full name, signed by you and Oracle's Board of Directors."** *Id*, p. 3 (emphasis

1   added).

2   While working at Oracle, Johnson was never explicitly informed of a change in her

3   arbitration Agreement, by Oracle or anyone else, orally or in writing. Johnson Decl.¶ 2.

4   **C.   Oracle's Terms and Conditions and Incentive Compensation Plans**

5   Throughout Johnson's employment, Oracle periodically revised and reissued two key

6   documents pertaining to the calculation and payment of commissions to salespeople: the

7   "Terms and Conditions" ("T&Cs") and the Individualized Compensation Plans ("ICPs").

8   The T&Cs is a generally-applicable document that sets forth Oracle's protocols for

9   calculating and paying commissions.  ICPs inform employees of the individual terms of their

10  commission plans. Johnson's personnel records reflect that the Company imposed six (6)

11  ICPs on Johnson, spanning Fiscal Years 2013 through 2015. Oracle contends that the FY15

12  ICP and T&Cs supply the operative agreement to arbitrate (putative Agreement #2).

13  **(i)   Oracle Maintains That Employee Notice and Consent is Not Necessary for
14       the T&Cs and the ICPs to Apply**

15  Oracle imposes the T&Cs on sales employees regardless of whether they sign or

16  consent to the document, based simply on their continued employment. Even "performance

    of any work" or "acceptance of any payments under the Plan" ostensibly constitutes
17
    acceptance. Valerian Decl., Ex. D, p. 4. There is no employee or employer signature and no
18
    signature lines anywhere in the T&Cs. Oracle asserts, without exception, that "Oracle's
19
    FY15 Terms & Conditions document applies generally to all incentive-compensation eligible
20
    people employed during FY15." Dkt. 13, Declaration of Brendan Dolan ISO Resp.'s Motion
21
    to Stay ("Dolan Decl.") ¶ 11.
22
    The 96-page FY15 T&Cs is not negotiable. Discovery will confirm that employees
23
    cannot accept, or even specifically acknowledge, individual provisions of the T&Cs,
24
    including the appendix related to arbitration. Similarly, there is no option to specifically
25
    acknowledge or decline the language regarding obligation in the FY15 ICP. The only
26
    purported option presented to employees is to "Accept" the documents in their entirety. Even
27
    this choice is specious, as Oracle regards both documents as effective whether or not the
28

1    employee clicks "Accept."

2        Thus, notwithstanding Oracle's efforts to present the T&Cs under the guise of a

3    contract, the compensation plan documents are like any other unilaterally-imposed policy.

4    Under Oracle's Employment Agreement, which may be modified or revised *only in*

5    *accordance with strict procedures*, Oracle's attempt to impose less favorable and more

6    restrictive arbitration conditions on employees through the T&Cs and ICPs is abortive.

7        **(ii) Oracle Imposed the FY15 T&Cs and FY15 ICP on Petitioner Without**
         **Proper Notice and Without Her Signed Consent**
8

9        Oracle rolled out Johnson's FY15 ICP and the FY15 T&Cs following the same

10   process it had used in previous years. *See* Dkt. 14-2, Declaration of Si Lutz ISO Motion to

11   Stay, ¶ 4; Johnson Decl. ¶ 3. According to the Lutz Declaration, on June 1, 2014, Johnson

12   received a workflow notification via e-mail. Oracle has not provided Petitioner or the Court

13   a copy of this email, and Johnson is not in possession of one. Johnson has retained a workflow

14   notification email from 2013, which she believes is similar. It informs her, "[a] new Sales

15   Compensation Plan[…] has been approved, and is awaiting your acceptance." Johnson Decl.

16   ¶ 3, Ex A.

17       The workflow email goes on to instruct: You MUST first read and accept the Terms

18   and Conditions by clicking the "Accept" button located in the bottom left hand corner. [¶]

19   After acceptance of your Terms and Conditions, the face of the plan is displayed. Carefully

20   review your Sales Compensation Plan prior to accepting. *Id.* (emphasis in original).

21        Further, Oracle secures employees' compliance by holding their compensation

22   hostage, *even those wages previously earned and due*. Oracle states in the workflow

23   notification that failure to "accept" the plan within 24 hours "will result in nonpayment of

24   any commission or bonus made against the Sales Compensation Plan." *Id.* ¶ 4, 5. In practice,

25   this affects not only commissions to be earned in the future, but also commissions earned in

26   the past. In the U.S., Oracle generally follows a 45-days-in-arrears timing schedule for

27   commission payments. Declaration of Xinying Valerian ¶ 5, Ex E (Henderson Dep., p. 238,

28

PET. MARCELLA JOHNSON'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

lines 11-14, 22-23; p. 240, lines 8-19). In light of Oracle's arrears policy, its "nonpayment" statement reads as a warning that Oracle will withhold accrued and payable commissions from prior sales. Accordingly, any argument that employees who disagree with the new T&Cs and ICPs may simply choose to leave Oracle is misplaced. They would have to forfeit their wages to do so.

Oracle has not produced images of the screen Petitioner or other employees would have seen when she allegedly clicked "accept" for either the T&Cs or the ICP. Without details regarding Oracle's disclosures and the employee's supposed representations, the meaning of such "acceptance" is not clear.

In fact, Johnson believes she clicked a button to accept the FY15 T&Cs without reading the entire document in order to be able to view the ICP issued to her. Johnson Decl. ¶ 6. She gleaned relevant information regarding her compensation plan – the thrust and purpose of the documents in this and every other year – but did not notice any reference to arbitration. *Id.* ¶ 6, 7. Petitioner never signed her name to the T&Cs or ICP – either by hand or electronically. Oracle has not produced a copy of the T&Cs containing Petitioner's name. Nor was either document signed by Oracle's Board of Directors. Finally, the documents do not expressly reference the Employment Agreement & Mutual Agreement to Arbitrate (Agreement #1) and do not indicate that they modify this agreement.

**(iii)  Oracle Buried an Arbitration Provision 84 Pages Into the 96-page T&Cs**

Neither the ICP nor the T&Cs for the 2013 and 2014 fiscal years make reference to arbitration. The workflow notification Petitioner received on June 1, 2014 provided no notice that the FY15 materials differed in this respect.

The FY 15 T&Cs is a 96-page document primarily concerned with commission and bonus policies and eligibility, covering all Oracle products and businesses worldwide. Valerian Decl., Ex D. It provides no notice of a significant change to, or novation of, Agreement #1.   The phrase "Appendix 9: Agreement to Arbitrate Disputes" is the penultimate item in the document's table of contents. Nothing about this reference indicates

that Appendix 9 materially modifies the parties' existing Agreement #1. The "Introduction" does not mention an arbitration agreement. Nowhere does the T&Cs state that Appendix 9 differs from the provisions of Agreement #1.

"Appendix 9: Agreement to Arbitrate" appears on page 84 and page 85 of the T&Cs. *See* Valerian Decl., Ex. D, pp.84-85. It differs substantively from the Agreement #1 arbitration clause in only one way: an inconspicuous class, collective, and representative action waiver provision in the middle of page 84.

Further, Appendix 9 reiterates that modification to Oracle's arbitration provisions "is effective only where ***in a writing signed by the Employee and Oracle's Board of Directors, which expressly refers to Appendix 9 and clearly describes the modification***." *Id*, p. 85 (emphasis added). Thus, Oracle appears to reaffirm the Company's commitment to abiding by the express conditions it placed on modification to Petitioner's Employment Agreement.

Johnson could not have known at the time she "accepted" the T&Cs that Appendix 9 applied to her specifically.  For example, the T&Cs state that "Disputes arising under the Plan that are not resolved informally *may* be subject to resolution/adjudication by arbitration. Employees' Individualized Compensation Plans indicate whether claims/disputes are subject to arbitration." *Id.* p. 7 (emphasis added). Several references to Appendix 9 applying to U.S. employees are interspersed throughout the T&Cs, but they do not define which U.S. employees are subject to Appendix 9.

Only after the T&Cs have been accepted, causing the ICPs to be displayed, do employees have a chance to construe the ICP's fine print to figure out whether Appendix 9 applies to them. But the ICPs themselves are vague and difficult to decipher. In small print on the second page, Johnson's FY15 ICP states: "I have read and agree to be bound by the FY15 Terms & Conditions, including but not limited to the Agreement to Arbitrate Disputes in Appendix 9 if Appendix 9 is listed below as being applicable to me." Dkt. 14-3. Further below in the ICP, Appendix 9 is included among the List of Applicable Appendices for U.S. employees. Nowhere is there an unequivocal acknowledgment that as a U.S. employee, a

particular named individual understands that she is bound by Appendix 9.  Such confusing fine print cannot be construed to put an employee such as Johnson on notice of a material change to her Employment Agreement (Agreement #1).

In sum, Oracle did not provide clear notice – or any *advance* notice – to Johnson and other sales employees that Appendix 9 (putative Agreement #2) was replacing or modifying the similarly titled "mutual agreement to arbitrate disputes" in the original employment agreement (Agreement #1). Johnson Decl. ¶ 8, 9.

### D. Oracle Has Relied on the Employment Agreement (Agreement #1) to the Exclusion of Appendix 9 (Putative Agreement #2) in Similar Cases

Oracle's course of practice suggests that, prior to this case, it did not consider Appendix 9 to have validly replaced or altered the Employment Agreement. In other cases, Oracle relied on the Employment Agreement instead of Appendix 9. There may be more.

### (i) *Gee v. Oracle*: Oracle used the Employment Agreement to question the DLSE's jurisdiction over a claim filed by a Fiscal Year 2015 sales employee.

According to records Petitioner's counsel obtained through a Public Records Act request, Oracle relied on the Employment Agreement in a Labor Commissioner proceeding in October 2015. Valerian Decl. ¶¶ 6, 10-11. Documents produced by the Division of Labor Standards Enforcement (DLSE) reflect that Daryl Gee worked for Oracle as a sales employee from November 2014 through May 2015 (a period that falls within Fiscal Year 2015), when he quit. In September 2015, he initiated a DLSE complaint against Oracle for unpaid commissions. *Id.* ¶¶ 6-13, Exs. F, H, I, J, K.

According to the DLSE file, the only arbitration agreement Oracle presented to the State was the Employment Agreement. Mr. Gee and Mr. Dolan, who represents Oracle in the instant dispute, attended a hearing or conference on October 20, 2015. *Id.* ¶ 10, Ex. I. Later, in a "request for Opinion for Legal on Jurisdiction," the deputy labor commissioner, Wilson Balanga, wrote:

> Please review file as D raised the issue of Arbitration. When the position was offered to the Plaintiff he was emailed a link to Oracle's website to complete Employment packet. P signed the documents electronically. P has admitted

that he did not review the documents fully and he blindly e-signed the forms.

Valerian Decl. Ex. H. Oracle's counsel had submitted the "Employment Agreement & Mutual Agreement to Arbitrate" (i.e., Agreement #1) and a printout showing electronic acknowledgment of the agreement – resembling those in Petitioner's personnel file as produced by Oracle. *Id.*¶ 8, Ex. G. Thereafter, the deputy commissioner informed Mr. Gee that while the DLSE was maintaining jurisdiction for the time being, the jurisdiction situation "may change if the Defendant exercises the Arbitration clause of the *employment agreement*." (emphasis added). *Id.*¶ 7, Ex. F.  Mr. Gee did not respond to that letter and the DLSE closed the investigation. *Id.*¶ 13, Ex. K.

Oracle asserts that "Oracle's FY15 Terms & Conditions document apply generally to all incentive-compensation eligible people employed during FY15." Dolan Decl. ¶ 11. Mr. Gee was one such employee, and he would have been required to accept the FY 15 T&Cs and ICP.  Yet, Appendix 9 is conspicuously absent from the DLSE's file. Valerian Decl. ¶ 11. The DLSE accepted the sole arbitration agreement submitted by Oracle, Agreement #1. Thus, Oracle considered this Agreement, rather than Appendix 9, to govern Gee's claim.

### (ii) *Oracle v. Wilson*: Oracle arbitrated a sales commissions case to conclusion on the basis of the Employment Agreement

In an arbitration administered by JAMS in New York, Oracle litigated the commission claim of salesperson Felicia Wilson on the basis of the Employment Agreement. *See* Valerian Decl. ¶¶ 14-16, Exs. L, M. Wilson was a current employee as of January 2017 according to Oracle's Petition to Vacate Arbitration Award. *See id.* Ex L, ¶ 1. Wilson had been working at Oracle since August 2011, when she entered into the Employment Agreement & Mutual Agreement to Arbitrate. *See id.* Ex. M (Wilson's Employment Agreement). Pursuant to Oracle's contention that the FY15 Terms & Conditions document applies generally to all incentive-compensation eligible individuals, Wilson was subject to Appendix 9. Yet again, Oracle relied upon the Employment Agreement for arbitral jurisdiction and cited that agreement in seeking relief under the Federal Arbitration Act.

### (iii) Discovery into other cases will reveal the extent to which Oracle has arbitrated pursuant to the Employment Agreement in recent years

There is no reason to believe that the *Gee* and *Wilson* cases are anomalous cases where Oracle has invoked the Employment Agreement instead of Appendix 9. According to JAMS' statistical report of closed cases that it had administered (mandated by California Code of Civil Procedure §1281.96), JAMS has administered many employment arbitrations involving Oracle in California. Valerian Decl. ¶ 17. According to the JAMS statistics, which report only closed cases, six of these employment arbitrations were initiated after the start of Fiscal Year 2015. *Id.* ¶ 18. In AAA's recent statistical report of closed cases, there were four Oracle employment arbitrations initiated after the start of FY 2015. *Id.* ¶ 19-20. The case files in fora other than public courts are not easily accessible. Only targeted discovery will uncover the extent to which Oracle has invoked the Employment Agreement for arbitral jurisdiction in cases involving salespeople.

### E. Oracle Failed to Produce the FY15 T&Cs, In Violation of California Law

On February 14, 2017, Johnson's counsel requested employment records from Oracle, as was her right under the California Labor Code. Valerian Decl. ¶ 21. Cal. Lab. Code §§ 1198.5; 432. Among other things, Johnson requested: "Any and all instruments relating to the obtaining or holding of employment, including employment agreements, confidentiality agreements, commission agreements, incentive compensation plans and other incentive compensation agreements." Oracle produced records on March 10, 2017. Valerian Decl. ¶ 22. Labor Code § 1198.5 requires that an employer comply within 30 days of such a request.

On March 10, 2017, Oracle produced personnel records that included the Employment Agreement and ICPs. Neither the FY15 Terms & Conditions nor Appendix 9 was included in the personnel file. No other documents supporting the existence of an FY15 arbitration agreement were produced. Valerian Decl. ¶ 22.

Johnson then filed her arbitration claim in accordance with Agreement # 1.

### F. Oracle Has Improperly Relied on Appendix 9 to Resist and Stall Arbitration

Petitioner dismissed the original federal action without prejudice and, on May 24,

PET. MARCELLA JOHNSON'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

2017, filed a Demand for Class Arbitration with JAMS in San Francisco pursuant to the

Employment Agreement. On June 6, 2017, Oracle wrote to JAMS in response to Petitioner's

Demand for Class Arbitration, attaching "Appendix 9: Agreement to Arbitrate Disputes."

Oracle asserted that this Appendix 9, which it had previously failed to produce, was

the operative arbitration agreement because Petitioner had electronically accepted a Fiscal

Year 2015 Individualized Compensation Plan on June 2, 2014. Valerian Decl. ¶ 23, Ex. N.

Relying on JAMS Class Action Procedures Rule 1(a), Oracle contended that, because

Appendix 9 contains a class waiver, JAMS could not proceed with class arbitration, absent a

court order. *Id.* ¶ 23, Ex. N. Oracle relied on **JAMS Class Action Procedures Rule 1(a)**,

which states:

> JAMS will not administer a demand for class action arbitration when the underlying agreement contains a class preclusion clause, or its equivalent, unless a court orders the matter or claim to arbitration as a class action.

Oracle did not, however, claim that court was the appropriate forum for Petitioner's claims.

Nor did it expressly oppose arbitration of issues and claims other than class claims. Yet,

because of its objection to class procedures, Oracle has blocked the entire arbitration process

and refused to allow it to go forward.

Petitioner responded that Oracle's assertion of another arbitration agreement should

be addressed to the arbitrator pursuant to JAMS Employment Rule 11 (Interpretation of

Rules and Jurisdictional Challenges). Valerian Decl. ¶ 24, Ex. O. Rule 11(b) states:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. Unless the relevant law requires otherwise, the Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.[2]

Petitioner maintained that JAMS Class Action Procedures Rule 1(a) was not applicable and,

---

[3] JAMS Employment Arbitration Rules & Procedures Effective July 1, 2014, available at https://www.jamsadr.com/rules-employment-arbitration/ (last visited October 4, 2017).

PET. MARCELLA JOHNSON'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

1   at the very least, it was premature to apply it prior to resolving the parties' dispute about

2   which arbitration clause was "the underlying agreement."

3   On June 13, 2017, JAMS wrote to the parties, in agreement with Petitioner's position.

4   *See* Valerian Decl. ¶ 25, Ex. P.

5   Oracle continued to resist by, among other things, refusing to pay any fee to JAMS.

6   But, JAMS' share of the initial filing fee is the same in either individual or class arbitration:

7   $800.[3] JAMS has confirmed that Oracle is responsible for that amount. *Id.* ¶ 26. Plaintiff paid

8   her filing fee when she filed the Demand for arbitration. Oracle refused to pay.

9   By withholding its share of the initial filing fee, Oracle prevented JAMS from moving

10   forward in administering the arbitration. Upon Oracle's request, on July 14, 2017, Petitioner

11   provided Oracle and JAMS with further information in an attempt to persuade Oracle to

12   comply. Valerian Decl. ¶ 27, Ex. Q. On August 4, 2017, Oracle communicated to Petitioner

13   that it would not be participating in any process in JAMS in connection with Johnson's class

14   arbitration demand and would not be paying any fees to JAMS. *Id.* ¶ 28, Ex. R.

15   On August 25, 2017, Petitioner submitted her First Amended Demand for Class

16   Arbitration to JAMS, thereby adding individual, non-class claims for forced labor and debt

17   servitude to the operative pleading. For this reason, Petitioner asked Oracle to reconsider its

18   position. Oracle persisted in refusing to participate in any JAMS arbitration or pay any fee

19   to JAMS. *Id.* ¶ 29.

20   **G.  Petitioner Filed the Instant Petition to Compel Arbitration**

21   On September 6, 2017, Petitioner initiated this action under the FAA to compel

22   Oracle to arbitration. To avoid further delay, Petitioner remitted the remainder of the filing

23   fee of $800 to JAMS with a reservation of rights, on September 15, 2017. Thereafter, JAMS

24   finally initiated the arbitrator selection process. Oracle then requested a stay of the arbitration

25   and threatened to seek an emergency injunction. *See* Valerian Decl. ¶¶ 30-32, Exs. S, T.

26

27   [4] Both Agreements at issue state: "Oracle agrees to bear the arbitrator's fee and all other costs related to arbitration, to the full extent such costs are not expenses that [you][Employee] would be required to bear if [you][Employee] were bringing an action in a court of law."

28

1    After reviewing the parties' submissions, JAMS' General Counsel again reiterated

2    JAMS' decision that it will proceed with the arbitrator selection process, explaining that the

3    issue of which agreement controls is a threshold question for the arbitrator to determine

4    pursuant to JAMS Employment Rule 11. Valerian Decl. ¶ 33, Ex. U.

5    The parties stipulated to a briefing schedule for Oracle's emergency motion for a stay

6    and the instant Motion to Compel Arbitration. Dkt. 5. On October 4, 2017, the Court granted

7    Oracle's motion for a stay. Dkt. 20.

8    **III.  LEGAL STANDARD**

9    A party to an arbitration agreement may, upon refusal of the other party to arbitrate a

10   dispute arising under the agreement, move to compel arbitration. 9 U.S.C. § 2. A district

11   court's role under the FAA "is limited to determining whether a valid arbitration agreement

12   exists and, if so, whether the agreement encompasses the dispute at issue. If the answer is

13   yes to both questions, the court must enforce the agreement." *Lifescan, Inc. v. Premier*

14   *Diabetic Servs.*, 363 F.3d 1010, 1012 (9th Cir. 2004).

15   **IV.  ARGUMENT**

16   Petitioner has sought nothing more than to comply with her mandatory Employment

17   Agreement, the arbitration agreement she had accepted as a condition of employment, and

18   to resolve threshold disputes that have delayed the commencement of arbitration for several

19   months. Under the JAMS rules and under Ninth Circuit law, authority to resolve the parties'

20   arbitrability disputes, except for enforceability of Oracle's class action waiver, has been

21   delegated to the arbitrator. However, if the Court were determined to resolve arbitrability

22   disputes to avoid further delay, Petitioner asks the Court to enforce the 2013 Employment

23   Agreement, not the FY15 Appendix 9, for reasons elaborated below.

24   **A.  The Questions at Issue are Reserved for the Arbitrator**

25   This Court is presented with the question of whether the Court or arbitrator should

26   decide which of the two arbitration clauses govern Petitioner's arbitration demand. Petitioner

27   claims that Agreement #1 applies and authorizes class arbitration while Oracle claims that

28

putative Agreement #2 applies and prohibits class arbitration. The parties' dispute over which Agreement is operative should be resolved by the arbitrator. This dispute involves "procedural" questions over the form and procedures of the arbitration, not whether arbitration is appropriate at all. Moreover, these questions have been clearly and unmistakably delegated to the arbitrator on account of the incorporation of JAMS rules into both arbitration clauses as well as the provision that the arbitrator shall resolve all disputes and shall exercise the powers of a judge in doing so. A narrow exception to the general delegation, for rulings on legality of the class waiver, should not prevent the arbitrator from ruling on all other arbitrability questions. Under the Ninth Circuit's rulings in *Oracle Am., Inc. v. Myriad Grp. A.G.* (2013), *Brennan v. Opus Bank* (2015), and *Mohamed v. Uber Technologies* (2016), Oracle is compelled to arbitrate arbitrability save for questions about the legality of the class action waiver in putative Agreement #2.

### (i) Once a party's substantive claim is designated for arbitration, issues on how that claim will proceed – including contractual questions as to whether class procedures are available – are procedural matters for the arbitrator.

Under federal law, courts ordinarily determine a very limited set of discrete "gateway" issues as to whether a dispute is "arbitrable" – that is, whether it belongs in arbitration or in court. This includes "substantive" questions of whether the arbitration clause at issue is valid and enforceable and covers the claims the plaintiff seeks to pursue. In contrast, arbitrators determine "procedural" issues about what the arbitration will look like, including whether class procedures are available. *See, e.g., Green Tree Fin. Corp. v. Bazzle*, 539 U.S 444, 452-53 (2003); *BG Group, PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1206-1208 (2014); *Citigroup, Inc. v. Abu Dhabi Investment Auth.*, 776 F.3d 126, 129-30 (2d Cir. 2015).

Here, both parties agree that Johnson's substantive employment-related claims against Oracle belong in arbitration – regardless of which Agreement applies. The parties part ways on a procedural question: whether, based on principles of contract formation and interpretation, the operative Agreement permits or prohibits class-based proceedings. This is

a procedural question reserved for the arbitrator. *See, e.g. Bazzle*, 539 U.S. at 452-53 (question reserved for arbitrator because it does not concern whether arbitration applies but "what kind of arbitration proceeding the parties agreed to"); *Sandquist v. Lebo Automotive Inc.*, 1 Cal. 5th 233, 251-55 (2016) (considering issue under FAA and applying *Bazzle*); *Sanford v. Memberworks, Inc.*, 483 F.3d 956, 964 (9th Cir. 2007) (characterizing *Bazzle* as binding precedent holding "that the question whether a contract permits class arbitration is an issue for the arbitrator to decide"); *Lee v. JPMorgan Chase & Co*., 982 F.Supp.2d 1109, 1114 (C.D. Cal. 2013) ("The only question, as in *Bazzle*, is the interpretive one of whether or not the agreements authorize Plaintiffs to pursue their claims on a class . . . basis. That question concerns the procedural arbitration mechanisms available to Plaintiffs, and does not fall into the limited scope of this Court's responsibilities in deciding a motion to compel arbitration.")

The question at hand is a procedural one – whether the arbitration may take a class form – and therefore the arbitrator should decide which agreement governs.[4] If, and only if, the arbitrator deems putative Agreement #2 to be valid and controlling might the enforceability of the class waiver be put to the Court pursuant to the incorporation of JAMS Class Action Rule 1(a).

### (ii) Incorporation of JAMS rules constitutes clear and unmistakable general delegation of authority to arbitrate arbitrability

But, even if the matters at issue here are determined to present substantive questions of "arbitrability," they are still reserved for the arbitrator. Parties may depart from the default rule that courts decide substantive arbitrability by "clearly and unmistakably" delegating the issue of arbitrability to arbitration. *AT&T Techs., Inc. v. Comm'c'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Accordingly, courts must defer "questions of arbitrability" to the arbitrator where the parties have "clearly and unmistakably" agreed that the arbitrator must

---

[5] Likewise, assuming that Agreement # 1 applies, it is for the arbitrator to determine whether that agreement provides for class procedures. *See, e.g. Bazzle*, 539 U.S. at 452-53; *Sandquist*, 1 Cal. 5th at 251-55.

decide those issues. *Rent -A-Center, West, Inc., v. Jackson*, 561 U.S. 63, 68-70 (2010). In the Ninth Circuit, incorporating arbitral forum rules – such as AAA and JAMS rules – that allow for the arbitrator to determine arbitrability constitutes "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130-31 (9th Cir. 2015); *Oracle Am. v. Myriad Group A.G.*, 734 F.3d 1069, 1074 (9th Cir. 2013).

Here, too, the incorporation of JAMS and AAA rules into both versions of Oracle's arbitration agreements delegated arbitrability questions to the arbitrator. Both agreements dictate: "The arbitration proceedings shall be conducted… in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association or the Employment Arbitration Rules and Procedures adopted by Judicial Arbitration & Mediation Services ("JAMS")." As set forth above, JAMS Employment Arbitration Rule 11 expressly states that questions of jurisdiction and arbitrability are to be decided by the arbitrator. *Malone v. Superior Court*, 173 Cal. Rptr. 3d 241, n. 20 (Cal. Ct. App. 2014) (noting that since at least 2003 the JAMS rules allow an arbitrator to determine arbitrability).

As noted by the Ninth Circuit in *Brennan*, the rule is especially forceful where the party attempting to avoid arbitration is a sophisticated party. *Id.* at 1130. Oracle is a sophisticated party that imposed mandatory arbitration on its employees, drafted both arbitration agreements, and has already litigated and lost this very issue of delegation. In *Myriad Group*, Oracle incorporated the forum rules of UNCITRAL into a license contract. 724 F.3d at 1071. In *Myriad*, as here, Oracle argued that there was no delegation of arbitrability disputes to the arbitrator. However, the Ninth Circuit held that the incorporation of UNCITRAL constituted clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *Id.* at 1077.

The arbitration language in the Oracle license contract at issue in *Myriad* is similar to Oracle's employment arbitration agreements. Both provide that "any dispute arising out of or relating to…" the relationship at hand is subject to final arbitration, with enumerated exceptions, and the arbitration is to be administered "in accordance" with a set of expressly

identified rules. And those rules both provide for resolution of arbitrability by the arbitrator.

### (iii) Under *Mohamed v. Uber*, all arbitrability questions save for the class waiver must go to the arbitrator

When there has been a clear and unmistakable general delegation of authority over arbitrability questions, as well as a narrow carve-out reserving one arbitrability issue for the court, *Mohamed v. Uber*, 848 F.3d 1201 (9th Cir. 2016) controls. There, the Court of Appeals analyzed two separate arbitration agreements. One of them, the 2013 Agreement rolled out by Uber, contained an express general delegation clause, as well as a clause stating that legal challenges to the class, collective and representative action waiver must be resolved by a court. The Court held the Agreement clearly and unmistakably delegated the question of arbitrability to the arbitrator except as pertained to the arbitrability of class action, collective action, and representative claims. *Id.*

JAMS Class Action Rule 1(a) does not support a different conclusion. Petitioner agrees that the Class Action Rules would apply to her class arbitration. Incorporation of that Class Action Rule into an arbitration agreement has no greater impact than the express reservation of court jurisdiction over legal challenges to a class waiver. It does not prohibit JAMS from addressing all other arbitrability questions. The presence of an exception to the arbitrator's authority to decide arbitrability does not divest the arbitrator of all authority to decide arbitrability. That conclusion would conflict with *Mohamed*. Authority over different questions of arbitrability can be split between the arbitrator and the court.

### (iv) Oracle's arguments about the class waiver provision are premature and, in any event, should not delay arbitration of all other arbitrability questions

A court would only have occasion to decide the enforceability of the class action under limited conditions: if Respondent successfully challenged Agreement #1 and received a determination that it was modified or superseded by Agreement #2. Oracle puts the cart before the horse. To reach the class waiver, the Court would have to decide all other arbitrability issues relating to which agreement controls – decisions properly vested with the arbitrator.

PET. MARCELLA JOHNSON'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

**B.  If the Court Holds that the Arbitrator Lacks Authority to Determine Which Arbitration Agreement Controls, it Should Find that Agreement #1 Controls.**

If the Court finds that it, not the arbitrator, must determine which agreement applies, then the Court must compel arbitration pursuant to the Employment Agreement or, in the alternative, permit discovery into factual disputes that bear on the determination.[5]

**(i)  Judicial estoppel bars Oracle from asserting that the first arbitration agreement is inapplicable**

The equitable doctrine of judicial estoppel holds that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotations omitted). Judicial estoppel can be applied to bar litigants from making incompatible statements in two different cases and where "prior statement was made in an administrative proceeding." *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 604-605 (9th Cir. 1996). The purpose of the doctrine is to protect the integrity of the judicial process by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012), *quoting New Hampshire*, 532 U.S. at 749-50. Whether to apply the doctrine is a matter of judicial discretion, guided by certain factors but not bound by a rigid or exhaustive formula. *Hersh v. Nat'l Found. Life Ins. Co.*, No. C-11-03289, EDL 2012 U.S. Dist. LEXIS 14133, *9 (N.D. Cal. Feb. 6, 2012) (Laporte, J.) (citations omitted) (setting forth the factors that may be considered).

Facing individual claims from salespeople, Oracle invoked arbitral jurisdiction on the basis of their Employment Agreements. Facing class claims from Petitioner, Oracle now invokes putative Agreement #2, arguing that Appendix 9 is an integrated contract superseding Agreement #1. This is a textbook example of "deliberately changing positions according to the exigencies of the moment." *Baughman*, 685 F.3d at 1133.

In the Gee case before the DLSE, Oracle took a clearly inconsistent position: It

---

[6] Petitioner makes this argument in anticipation of Oracle's arguments, originally advanced in its Motion to Stay Arbitration, that the Court should adopt Appendix 9 as the operative agreement.

PET. MARCELLA JOHNSON'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

claimed that the Agreement #1 was valid and enforceable. Yet, per Oracle's position in this case, the only applicable arbitration agreement for Mr. Gee would have been the FY15 Appendix 9. Nevertheless, in the *Berman* proceeding, Oracle raised an issue with the Labor Commissioner's jurisdiction and represented that the Employment Agreement arbitration agreement was valid and enforceable. *See* Valerian Decl. ¶¶ 8-11, Exs. G, H, I.

The Labor Commissioner accepted the Employment Agreement arbitration agreement as an agreement validly executed by Gee when he was offered the job and analyzed its enforceability. Because of Oracle's deliberate omission, the Labor Commissioner did not know about Appendix 9 and did not analyze its enforceability. Had Oracle raised Appendix 9, the DLSE may have been presented with the contractual defects raised here. With full awareness of Appendix 9, Oracle used the Agreement #1 because it was an expedient way to defend against an individual wage claim. As a result, Oracle succeeded in raising the "complexity" level of the case for the DLSE legal department through the specter of a motion to compel arbitration. *See* Valerian Decl. ¶ 9, Ex. H. As a further result, Oracle succeeded in gaining an unfair advantage over a *pro se* wage plaintiff who faced the prospect of losing the DLSE forum for adjudication of his claim.

The *Oracle v. Wilson* case provides further evidence of Oracle's recent reliance on the Employment Agreement in an individual claim. Oracle acknowledges that it uses standard form employment and arbitration agreements for all sales employees. There is no distinction between Johnson and these other salespeople that could justify Oracle's claim now that Appendix 9 is the operative agreement. Oracle's now contradictory claim cries out for application of judicial estoppel.

Alternatively, the Court should apply the doctrines of equitable estoppel or unclean hands based on Oracle's inconsistent positions, as well as its failure to disclose putative Agreement #2 in a timely manner – after Plaintiff had already removed her case from this Court and initiated arbitration proceedings pursuant to Agreement #1.

### (ii)   There was no valid modification

As set forth above, Johnson's Employment Agreement clearly provides that arbitration Agreement #1 may only be modified (1) in a writing (2) expressly referencing the original Agreement (3) expressly referencing Johnson by full name (4) signed by Johnson and (5) signed by Oracle's Board of Directors. Oracle was contractually bound to follow that procedure for any modification of the parties' obligations in the Employment Agreement. This modification provision clearly prohibits unilateral modifications or modifications that do not provide conspicuous notice of the fact that an existing agreement was being modified. None of these conditions are satisfied.

Here, Oracle unilaterally snuck an arbitral class waiver into the FY15 Terms & Conditions of Incentive Compensation in a manner that defied the letter and spirit of these modification provisions. Appendix 9 did not expressly reference the prior agreement, did not expressly reference the employee by full name, and was not signed by Johnson or by an Oracle Board member or delegate of the Board. Beyond that, Appendix 9 was rolled out in a surreptitious and oppressive manner.

Faced with a similar situation, both the Ninth Circuit and a California appellate court have invalidated companies' attempts to revise prior arbitration agreements by means that did not satisfy their own specified modification procedures:

> The district court found as a matter of fact that Countrywide did not effectively modify the arbitration agreement to include the revised fee scheme. The arbitration agreement itself provides that "**this agreement can be modified or revoked only by a writing signed by the Employee and an executive officer of the Company that references this Agreement and specifically states an intent to modify or revoke this Agreement**." Countrywide provides no evidence that it has complied with these requirements, and thus the district court properly found that the October 17 modification was ineffective.

*Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 786 (9th Cir. 2002) (emphasis added), *citing Mercuro v. Superior Court*, 116 Cal.Rptr.2d 671, 681 (Cal. App. 2002) (same). California courts are in agreement with the principle that a company must follow its own stated modification procedures when employment policies such as arbitration clauses are

changed. *See, e.g.*, *Mercuro, supra*; *Rebolledo v. Tilly's, Inc.*, 175 Cal.Rptr.3d 612, 627-28 (Cal. App. 2014) (holding that 2005 arbitration agreement did not validly modify 2001 agreement where earlier agreement required three executives' signatures for modification and the modification effected a material change in the scope of arbitrable claims).

In a later case, the Ninth Circuit reiterated the same principle: "Of course, if an employer has prescribed methods of policy modification and employee notice, it is incumbent upon the employer to abide by those methods." *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014), *citing Ferguson*, 298 F.3d at 786. In *Davis*, defendant-employer's employee handbook provided for 30-days' notice of changes and the question was whether Nordstrom satisfied this provision. *Id.*  The court held that it did, because the employees received individualized mailed notice stating the arbitration policy had changed and the company did not enforce the new provisions for more than 30 days. *Id.* at 1094. *See Davis v. Nordstrom, Inc.*, No. C 11-3956 CW, 2012 U.S. Dist. LEXIS 139563, *10-11 (Sept. 27, 2012) (Wilken, J.) (individually mailed cover letter enclosing new policy stated "Step three [Arbitration] of this process was recently updated).

Oracle does not come close, by comparison. *Ferguson* and *Davis* foreclose Oracle's attempt to change its arbitration agreement for its benefit – and to the detriment of employees – without following its own prescribed methods of modification and notice. Oracle drafted an Employment Agreement containing sensible and clear requirements to ensure that there was clear notice of modification. Yet, Oracle did not follow its own requirements. Not only that, it did the exact opposite: It buried the class waiver and hid the change from sales employees, foisting on employees a rushed and convoluted "workflow" process that virtually guaranteed that employees would "accept" Appendix 9 without understanding that it materially changed the terms of arbitration. And even after Fiscal Year 2015, Oracle continued to issue the original Employment Agreement (containing Agreement #1) to new employees only to follow it up with the concealed class waiver embedded deep within the Incentive Compensation Terms & Conditions. This bespeaks a calculated purpose to deceive.

### (iii)   Oracle gave inadequate and unreasonable notice

Even were Oracle not contractually bound to follow prescribed methods for changing the Employment Agreement, Appendix 9 is unenforceable because Oracle gave inadequate and unreasonable notice and presented it, along with the rest of the incentive compensation plan package with a threat of nonpayment of commissions earned and due to employees. Even when a company does not adopt particular notice or modification requirements, it must still "provide[] employees with reasonable notice" in order to modify a contract, and the modification may not "interfere with vested employee benefits." *Davis,* 755 F.3d at 1093, *quoting Asmus v. Pac. Bell*, 23 Cal. 4th 1, 11 (Cal. 2000).

Oracle cannot satisfy these requirements. Oracle did not inform Johnson that Appendix 9 contained a different arbitration agreement than the original Agreement #1. Johnson Decl. ¶ 8. In Appendix 9, there is an inconspicuous reference on the second page to "Agreement to Arbitrate Disputes in Appendix 9 if Appendix 9 is listed below as being applicable to me" with no indication that this related to a changed arbitration agreement. There was no notification that this refers to a new arbitration agreement. To detect the difference, an employee would have to scrutinize Appendix 9 and compare it to her original employment agreement. And do so while under an imminent threat of "nonpayment" of her wages.

Further, Oracle hid a material change in the scope of arbitrable claims as part of the "workflow" process for issuance of compensation plans. That process was inherently coercive for sales employees. At the beginning of the month, employees are looking forward to their pending commission payments for past transactions. As the month goes on they will continue to close deals and earn commissions. Then Oracle springs new T&Cs and ICPs on them and demands that they accept everything within 24 hours, or else have their commission payments withheld. *See* Johnson Decl. ¶¶ 2-5, Ex. A. Under these conditions, employees cannot be said to have voluntarily accepted fundamental revisions to their rights precluding them from pursuing class claims.

### (iv)   There is no competent evidence of the formation of a second contract with mutual intent to replace the first

Oracle's reliance on the integration clause in Appendix 9 does not resolve the questions of contract formation, modification, novation, and notice in the context of changes to an employment agreement. Oracle, who has the burden on all of these issues, has failed to provide competent evidence of a mutual FY15 arbitration agreement between Oracle and Johnson, despite several opportunities to do so. The Lutz Declaration (paragraphs 4, 5, 6, and 9) in support Oracle's Motion to Stay Arbitration does not provide admissible testimony proving assent. Fed. R. Evid. 602, 1002. Evidence has not been introduced to establish Mr. Lutz's personal knowledge of the matters stated in those paragraphs. No evidence has been provided to support the authenticity of the purported electronic signature on the ICP document. Dkt. 14-3, Lutz Decl., Ex. 1. Meanwhile, no one's signature, handwritten or electronic, appears on Appendix 9 itself. Moreover, Oracle has withheld the actual notification e-mail referenced by Mr. Lutz and the full document from which Appendix 9 was excerpted. In short, Oracle has failed to establish the existence of an agreement.

### (v)   Appendix 9 cannot lawfully apply to existing disputes and claims

Appendix 9 retroactively applies to "any existing … disputes or claim" Valerian Decl., Ex. D, p. 84. However, "an employer may not make unilateral changes to an arbitration agreement that apply retroactively to 'accrued or known' claims because doing so would unreasonably interfere with the employee's expectations regarding how the agreement applied to those claims." *Avery v. Integrated Healthcare Holdings, Inc.*, 159 Cal. Rptr. 3d 444, 453 (Cal. Ct. App. 2013), *quoting Peleg v. Neiman Marcus Group, Inc.*, 204 Cal.App.4th 1425, 1465 (2012). The critical point in time is when the claims accrued, not when a lawsuit was filed. *See id.* Oracle's re-plan decision in question occurred in Fiscal Year 2014. Ms. Johnson's commission dispute had already existed for months by the time Oracle rolled out the Fiscal Year 2015 Incentive Compensation Plans (and Appendix 9). Further, Oracle likely had knowledge of Ms. Johnson's commission dispute and those of any other sales employee – and in particular potential class members who suffered and

complained of retroactive re-plans and associated loss of commission wages – at the time it rolled out Appendix 9. This is relevant to whether it would breach the implied covenant of good faith and fair dealing to apply Appendix 9 retroactively to existing claims and disputes or "accrued or known claims." *See Avery*, 159 Cal. Rptr. 3d at 453.

### (vi)   Appendix 9 is unconscionable

A court may invalidate an arbitration agreement when it is both procedurally and substantively unconscionable, with procedural and substantive unconscionability existing on a sliding scale. *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1072 (9th Cir. 2007), overruled on other grounds by *Kilgore v. KeyBank, N.A.*, 673 F.3d 947, 960 (9th Cir. 2012).

The adhesive Appendix 9 is marked here by oppression and surprise of the highest degree. Appendix 9 is indisputably a contract of adhesion. For an existing employee, Appendix 9 is a requirement of continued employment and payment of commissions. *See* Valerian Decl., Ex. D, p. 84; Johnson Decl. ¶ 4-5, Ex. A. Appendix 9 is embedded deep in a 96-page Terms & Conditions document, which employees had to accept within 24 hours. The class action waiver was concealed in this overwhelmingly long and prolix document.

At least three substantively unconscionable provisions are present: Appendix 9's sweeping in any existing claims and disputes is contrary to California law, as discussed above. It also exempts from arbitration the claims Oracle is most likely to bring against its employees (e.g. temporary equitable relief). That carve-out is not reasonably justified given that parties subject to arbitration agreements do have access to emergency relief in court under California Code of Civil Procedure § 1281.8. *Colvin v. NASDAQ OMX Group, Inc.*, No. 15-cv-02078-EMC, 2015 U.S. Dist. LEXIS 149932, *14-15 (N.D. Cal. Nov. 4, 2015)(Chen, J.); *Mercuro*, 116 Cal. Rptr. 2d at 678. The representative action waiver and the prohibition on making any award to a person or entity not a party of the arbitration are illegal waivers of a PAGA representative action, which would award penalties to the State of California, a non-party. *See Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348, 383 (Cal. 2014) (holding that PAGA waivers violate public policy). Separately, the class and

collective action waiver is a violation of the National Labor Relations Act, 29 U.S.C. § 158. *Morris v. Ernst & Young, LLP*, 834 F. 3d 975 (9th Cir. 2016), *cert granted*, 137 S. Ct. 809 (2017). On the whole, more than enough one-sidedness exists to hold that Appendix 9 runs afoul of *Armendariz v. Foundation Health Psychcare* Servs., Inc., 99 Cal. Rptr. 2d 745 (2000) and should not be enforced.

### (vii)   Tailored arbitrability discovery is necessary – but overlaps with merits discovery

If the Court exercises jurisdiction over the arbitrability issues presented by Petitioner, Petitioner would request that the Court permit discovery on factual issues relevant to deciding which of the two agreements control. *See, e.g., Toppings v. Meritech Mortg. Servs.*, 140 F. Supp. 2d 683, 685 (S.D. W. Va. 2001) (authorizing discovery on issues within the arbitrability analysis). Petitioner is entitled to discovery related to formation of the purported Agreement #2, the arbitration agreements Oracle used in other cases, and the applicability of Appendix 9 to her claims and other "accrued or known" claims of potential class members. In this case, therefore, some of the arbitrability discovery will overlap with merits discovery.

### C.   Assuming that Agreement #1 Applies, Whether it Permits Class Arbitration Is a Clause Construction Matter for the Arbitrator

Under the first arbitration agreement, class arbitrability is a clause construction matter to be determined by the arbitrator. Courts in this district have consistently found that, in the absence of an explicit waiver or authorization of class claims, whether an arbitration clause permits or precludes the arbitration of class claims is a question for the arbitrator. *See Yahoo! Inc. v. Iversen*, 836 F. Supp. 2d 1007, 1012 (N.D. Cal. 2011) (Koh, J.) (relying on arbitration clause's reference to the American Arbitration Association (AAA) rules and supplementary rules to conclude that the parties intended for an arbitrator, not the court, to decide whether an employee could arbitrate his claims on a class-wide basis; *Davis v. CACH, LLC*, No. 14-cv-03892-BLF, 2015 U.S. Dist. LEXIS 25088, *23 (N.D. Cal. Mar. 2, 2015 2015) (Freeman, J.) (citing cases). Here, Agreement #1 conferred on the arbitrator "all the powers a judge would have in dealing with any question or dispute that may arise before, during and after

1   the arbitration" and adopted JAMS and AAA rules providing that the arbitrator shall

2   determine as a threshold matter whether the arbitration can proceed on behalf of or against a

3   class. *See* AAA Supplementary Rules for Class Arbitration, Rule 9, and JAMS Class Action

4   Procedures, Rule 2 ("Construction of the Arbitration Clause").[6] In addition, even without

5   such express delegation, the default rule is that arbitrators determine procedural questions

6   such as whether an agreement provides for class procedures. *See, e.g. Bazzle*, 539 U.S. at

7   452-53; *Sandquist*, 1 Cal. 5th 233, 251-55. Therefore, if Johnson's claims are arbitrated

8   pursuant to the Employment Agreement, the arbitrator will decide whether the arbitration

9   clause authorizes a class proceeding under all appropriate principles of clause construction.

10  Oracle's *Stolt-Nielsen* argument is premature.

11  **V.   CONCLUSION**

12         For the foregoing reasons, the Court should grant Petitioner's motion to compel

13  arbitration. Here, it is undisputed that Claimant Johnson shall arbitrate her employment

14  related disputes against Respondent Oracle. Thus, Oracle has impermissibly interfered with

15  and delayed the arbitration process. The issue of which arbitration Agreement applies and

16  whether that Agreement allows for class procedures are matters designated for the arbitrator.

17         In the alternative, the Court should hold that arbitration Agreement #1 (contained in

18  Petitioners' Employment Agreement & Mutual Agreement to Arbitrate) remains operative

19  and reserve for the arbitrator the question of whether that Agreement authorizes class

20  proceedings. Oracle has failed to satisfy, and even deliberately circumvented, the applicable

21  requirements to modify the original arbitration provision.

22         Respectfully submitted,

23  Dated: October 5, 2017

24                                              By: /s/ Xinying Valerian
                                                Xinying Valerian
25                                              VALERIAN LAW

26  [7]     AAA's class action rules are available at
    https://www.adr.org/sites/default/files/Supplementary%20Rules%20for%20Class%20Arbitrations.p
27  df (last visited October 4, 2017). JAMS class action rules are available at
    https://www.jamsadr.com/rules-class-action-procedures/ (last visited October 4, 2017).
28

1

2

Danielle Fuschetti
SANFORD HEISLER SHARP, LLP

3

*Counsel for Petitioner Marcella Johnson and*

4

*Proposed Class*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PET. MARCELLA JOHNSON'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION